JETT v. DYKE ASSOCIATES, INC.

5-245                                        263 S. W. 2d 703

Opinion delivered January 11, 1954.

*Cockrill, Limerick & Laser* and *Wright, Harrison, Lindsey & Upton,* for appellant.

*House, Moses & Holmes,* for appellee.

GRIFFIN SMITH, Chief Justice. The suit involves ownership of 290 shares of the common stock of Dyke Associates, a management corporation. Herbert L. Jett contends that the stock was given to him August 20, 1951, in fulfillment of an indefinite promise made years ago by Nathaniel Dyke, Jr., acting for himself and his two brothers who own controlling interests in extensive incorporated enterprises, the management of which requires skilled and loyal personnel.

Arthur R. Noe and Jett were associated with Dyke Bros. in a confidential capacity and as executive heads, and had served in these capacities for many years. A memorandum dated August 23, 1951—three days after Jett received the stock certificates—refers to Noe as general manager of Dyke Bros., and to Jett as assistant general manager. Jett was also executive vice-president of Cole Manufacturing Company, a Memphis corporation operated by Dyke and primarily owned by the three brothers.

Jett's connection with the Dyke brothers goes back to 1923. In recent years his salary was from $700 to $800 per month, but bonus allowances at times brought it to $30,000 per annum.

Although Nathaniel Dyke insists that Jett became dissatisfied with his employment and had periodically—for a number of years—resigned or threatened to do so, the memorandum, according to Nathaniel's testimony ". . . was prepared for confidential information of Mr. Noe, Mr. Jett, and my brothers, and was a discussion as to how we could best operate Dyke Associates. *It was given in our closest official family* . . ."[1]

Jett testified that from July, 1949, until March, 1950, he was not with the company, but gave no detailed reason for this interrupted service. It is not questioned, however, that upon resumption of work early in 1950 the previous relationship in respect of duties was reëstablished—if, indeed, an impairment of confidence on either side could be said to have occurred.

In matters affecting income, ownership, and operation of the various Dyke corporations the brothers were partners prior to their removal from Ft. Smith to Little Rock and thereafter. When the management corporation was formed in 1942 Jett and Noe were given ten shares each. Nathaniel Dyke testified that nothing was paid for this stock, the purpose being to qualify Jett and Noe as incorporators with Frank, Martin, and Nathaniel. Value of these original certificates was doubled by a stock dividend.

In 1942 Nathaniel Dyke went to Washington to serve as lumber consultant in connection with war activities. He worked as a dollar-a-year man until 1947, but seemingly kept in close contact with his business enterprises. During a part of that time Jett managed Cole Manufacturing Company at Memphis, but resided in Little Rock. Nathaniel testified that [presumptively in 1947] Secretary of the Treasury Snyder asked him to "clean house at the Federal Home Loan Bank Board." At that time

---

[1] Italics supplied throughout.

President Truman suggested that he take a position at $10,000 per year. Dyke had, however, entered into a bonus contract with Cole Mfg. Co. for fifty per cent of all yearly profits above $30,000. In speaking of Truman's proposal Dyke said: "I couldn't support this bonus contract—being in Washington on a salary—so Mr. Dean Acheson's partner (who is now dead) wrote an assignment of 80% of the bonus contract to be performed by Dyke Associates. . . . We had made an obligation to join a management association in New York, and they were down discussing how best to operate it."

Dyke further testified that Jett (seemingly at the time relationships were severed) held as trustee stock certificates in various corporations aggregating $300,000; that it was the partnership's policy to have stock issued to Noe or Jett, or one of the brothers, with endorsement in blank or specifically assigned. There was no testimony to show whether the corporation books reflected ownership of these shares, but in all instances except those affecting the 290 shares in question Jett disclaimed any personal interest. Noe, who held Associates stock equal to the 290 shares contended for by Jett, testified that he did not claim a personal interest.

Each owned stock individually in various Dyke corporations, some of which had been purchased and some given as bonus transactions at year's end covering periods when profits justified distribution. According to Nathaniel preferred stock was used as annuity compensation. This is stressed by the Dyke brothers to emphasize the improbability that the shares of common stock in question would have been used in the manner Jett contends they were.[2]

Substance of Jett's explanation of the transaction resulting in delivery of the stock is that two or three days before August 23, 1951, Nathaniel Dyke came to the company office he occupied, handed him the shares, and said, "Here are the certificates." Jett thought he said

[2] Bonus payments were not made to Jett in 1951, nor for 1949. Over a period of eleven years he drew in salary and bonus $179,300, of which $55,000 went for government taxes. Cash, in lieu of stock, was sometimes given as bonus compensation.

"Thank you," or something to that effect. But after delivery, and before April, 1952, Jett and Nathaniel Dyke talked about the stock, ". . . and one time he specifically told me they were my certificates without any reservation; and that was voluntary on his part."

This conversation probably occurred in December, 1951. But on April 9, 1952, Nathaniel called Jett to his office "and said he thought I had better give those certificates back to him." No reason was assigned. Jett, however, told Dyke he would like to wait and talk the matter over with Arthur Noe. On April 16th he told Dyke what his position would be and the latter commented, "Then you are not going to give those certificates back?", and Jett replied, "No, sir, you are asking too much."

Shortly thereafter Dyke wrote Jett that the certificates were being cancelled. He also listed certificates in six corporations representing 204 shares showing issuance in Jett's name, but endorsed in blank; also 898⅓ shares issued in Jett's name under a written *or oral* trust agreement "for our benefit, which requires you to endorse and deliver the certificates according to our instructions."

Included in the two lists totaling 1,102⅓ shares were the 290 claimed by Jett. Certificates (as to which Jett claimed no beneficial interest) amounting to 608⅓ had not, according to the Dyke letter, been endorsed by the trustee, but all were in Dyke's possession except the contested shares in Dyke Associates. It is fairly deducible that in referring to a written or oral trust agreement Dyke's contention as to the 290 shares was embraced within the term "oral." Jett's reply to Dyke's letter was that the 290 shares of Associates stock had been erroneously listed as property belonging to the three brothers, or to any of them.[3]

---

[3] Nathaniel Dyke testified that during an 18-month period before he went to Washington Cole Mfg. Co. made a net profit of $90,000 before taxes. In 1947 the profit was $369,000 *after bonuses,* and in 1948 $245,000 after bonuses. Jett was executive vice-president during these two years, but, according to Dyke, "he gave less and less time to the business." In the spring of 1947, with $400,000 in cash on hand, the Cole Company "almost ran out of lumber."

Late in 1949 the Memphis office of the Bureau of Internal Revenues placed an assessment of $200,000 against the Cole Company for 1946, 1947, 1948, "and possibly 1949." This amount was claimed in excess of taxes actually paid.[4] Either an apprehension that additional taxes would be assessed, or the fact that proceedings looking to that end had been initiated, caused Nathaniel Dyke to assign 80% of his Cole contract to Dyke Associates. According to Jett the government's active agent concluded that the contract was constructively fraudulent. Yet, at a substantially later period the claim was settled for $55,000.

Certificates numbered 18 and 36 for 135 shares are dated June 30, 1948. They were issued to Francis W. Dyke with endorsements showing immediate transfer to Herbert L. Jett. It is inferable that appellant believes that these certificates were not assigned in 1948, but that for some reason possibly having to do with avoidance of the government's tax assessment they were actually assigned in 1951 and back-dated to show interest-ownership as of 1948. Mrs. Susie Hagens Donoho of Fordyce, who was Nathaniel Dyke's private secretary in 1951, mentioned other certificates that were brought to her attention and said that Nathaniel Dyke instructed her respecting names and dates. The transaction disturbed her to such an extent that she telephoned her brother in California for advice. On cross-examination Mrs. Donoho became confused, and it is not correct to say that her testimony was reliably positive where the interests of third persons are concerned, although obviously she undertook to tell what happened as she remembered it.

While the chancellor found against Jett, he specifically rejected the idea that either of the principals was misstating any transaction as he understood the facts to be; hence the trial court's opportunity to appraise credibility because he heard the witnesses is no greater than ours. The statements of those upon whom reliance must

---

[4] According to Jett the assessment grew out of Nathaniel Dyke's contract with Cole for 50% of profits in excess of $30,000. At that time Nathaniel did not own any of the Cole stock.

be placed come into the record with the chancellor's affirmative expression of confidence in the veracity of Herbert Jett and Nathaniel Dyke, and Dyke on cross-examination explicitly said he did not believe that Jett had improperly gained possession of the certificates.

Arthur Noe was custodian of all the stock certificates and was secretary of most of the corporations. But obtruding is the unusual circumstance that Jett had possession of the questioned certificates and had kept them in his private lock box at a local bank since receiving them. When Nathaniel Dyke was asked whether Jett (during the time he had an office at 309 Center street where headquarters are now maintained) had access to various files in the vault and other papers of the different companies, the answer was, "I can't remember that he was ever refused access to anything." Another question and answer were: Question: "Except for not being designated the official custodian did [Jett] have just as much access and right to various records of the company as Mr. Noe did?" Answer: "Mr. Noe was the official custodian, but Mr. Jett was never refused access to anything and he had the run of the building."

It will be observed that these answers were in the nature of negative replies; but, aside from the expressions referred to there were statements that Jett had access to records.

If the result rested solely on oral testimony showing the course of conduct extending over a long period of time, the relationship of Jett to the Dyke enterprises and the partnership composed of the three brothers, Jett's unquestioned services to the organization and his own profits from salary, cash bonuses, and the acquisition of stock because of his status as an officer and employee of high value, and the admittedly abbreviated conversation Jett says attended the delivery of the certificates— in these circumstances we would agree with the chancellor that inter-party intent was not sufficient to justify a decree in favor of Jett.

Our view is that Dyke's purposes were more clearly expressed in the letter and memorandum of August 23, 1951, than in Nathaniel's testimony when the case was heard.

The letter was addressed to "ARN," "HLJ," and "FWD." Admittedly these symbols stand for Arthur R. Noe, Herbert L. Jett, and Francis W. Dyke. In the letter it was suggested that each should proceed to build up "a supporting file along the lines of the attached memo., *planning the different persons with whom HLJ and ARN had contact during the years under discussion. . . .*"

In the memorandum there is comment regarding an assumption that Nathaniel Dyke had been tendered full-time employment in Washington. During January and February, 1947, a number of Dyke meetings were held. It was decided that the best solution would be an assignment of 80% of Nathaniel's remuneration contract as manager for the Cole company. This would go to Dyke Associates. The following excerpt is important:

"Dyke Associates, Inc., was started in 1942 . . . for the main purpose of allowing top staff personnel to participate to a larger extent in the growth of the organization and increased earnings, and give them a stake in the business as whole, which could not practicably be done with Dyke Bros., since it was a partnership and was already too large for the personnel to buy any sizable share in same. It was agreed that the top staff personnel would be allowed to acquire both common and preferred stock in Dyke Associates, Inc., and receive not only remuneration in salary and bonuses, but the increment which should accompany the growth of the corporation over a long period of time."

Speaking of Noe and Jett, Dyke said:

"[They] were the two top staff associates occupying first place in these considerations and negotiations. Each already has a sizable investment in various corporations affiliated with the organization, *and these two men ac-*

*quired 135 additional shares of common stock each in Dyke Associates, Inc., at the same time that Dyke Associates, Inc., accepted the assignment of 80% of the management contract held by Nathaniel Dyke, Jr., with Cole Manufacturing Company.* . . . Both Mr. Jett and Mr. Noe acquired five shares each at the time of the incorporation and during 1948 the capital stock was increased from 1,500 shares of common stock to 3,000 shares of common stock, which doubled the original 10 shares to 20 for each Mr. Jett and Mr. Noe, *and also doubled their 135 shares to 270, giving each of them 290 shares common stock outstanding.* . . ."

The memorandum then refers to certain operations; to the fact that the writer was detained in New York and Washington a great deal of the time and that he occasionally had to go to the West Coast; that Francis W. Dyke had for a number of years been unable to give all of his time to the business on account of undulant fever, [therefore] ". . . it was understood by all that Mr. Jet and Mr. Noe would have to carry the burden of detail in the operation of Dyke Associates, Inc., and companies under management contract, *and that no tax would accrue to them on their common stock until they disposed of it, and it would be capital gain only* [for income tax purposes]."

Other parts of the memorandum emphasized the value of services rendered by Jett and Noe, and their long affiliation with the organization. In conclusion it contained the following:

"The only partners in Dyke Bros. are Nathaniel Dyke, Jr., Francis W. Dyke, and Martin T. Dyke, *so that while these three own more than 50% interest in the common stock in Dyke Associates, Inc., Mr. Jett, Mr. Noe, and Martin T. Dyke 3d, have a substantial ownership in the common stock of Dyke Associates, Inc., and do not have any interest whatsoever in Dyke Bros., a partnership.*"

When it is considered that the letter and memorandum were written three days after delivery of the cer-

tificates, and that ownership of a substantial interest is commented on as an existing fact, and that no tax would accrue to Jett and Noe on their *common stock* until it had been disposed of, it is difficult to understand how these statements under Nathaniel Dyke's signature can mean anything except that Jett and Noe owned what the writer said was theirs—hence we are not dependent upon the oral testimony of any of the participants.

Nathaniel Dyke insists that this memorandum was written "for discussion purposes"; but, unfortunately from that standpoint, he directed these associates to start building up "supporting files."

Our conclusion is that the certificates were either given to Jett as a part of the file-building process for reasons satisfactory to Dyke who retained in his own mind an intention he did not convey to the beneficiary—a reservation that he would later ask redelivery—or that the delivery was what Jett claimed it was, an outright gift based upon factors mentioned in the memorandum. In either event title passed and the right of recall comes too late.

Reversed, with directions to enter a decree enjoining cancellation of the certificates; or, in the alternative, if the certificates have been cancelled by official action of the board of directors, then a mandatory order should require reissuance as of the date of cancellation.